**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
Ilana Volkov, Esq.
Attorneys for Adamar of NJ In Liquidation, LLC,
f/k/a Adamar of New Jersey, Inc. and
Manchester Mall, Inc., Debtors

|  |  |
|---|---|
|  | UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY HONORABLE JUDITH H. WIZMUR CASE NO. 09-20711 (JHW) |

| In re:<br><br>ADAMAR OF NJ IN LIQUIDATION, LLC,<br><br>Debtors. | Chapter 11<br><br>**DEBTORS' MOTION PURSUANT TO SECTIONS 1112(b), 105(a) AND 305(a) OF THE BANKRUPTCY CODE FOR AN ORDER DISMISSING THEIR CHAPTER 11 CASES AND GRANTING RELATED RELIEF**<br><br>**HEARING DATE AND TIME:**<br>May 18, 2011, at 9:30 a.m.<br><br>**ORAL ARGUMENT REQUESTED** |

TO:    HONORABLE JUDITH H. WIZMUR
        Chief United States Bankruptcy Judge

    The Application of Adamar of NJ In Liquidation, LLC, f/k/a Adamar of New Jersey, Inc.,

d/b/a Tropicana Casino & Resort - Atlantic City ("Adamar") and Manchester Mall, Inc.

(collectively, the "Debtors"),[1] respectfully represents:

---

[1] In accordance with the Amended Agreement (as defined below) and the Court's Order approving same, Adamar and Manchester Mall, Inc. merged into Adamar of NJ In Liquidation, LLC. All three entities are collectively referred to herein as the "Debtors" for convenience.

## I.    PRELIMINARY STATEMENT

1.      The Debtors initiated these Chapter 11 cases to effectuate a sale of substantially

all their assets pursuant to Section 363 of the Bankruptcy Code.  The sale of the Debtors' assets

was mandated by the New Jersey Casino Control Commission (the "Commission") pursuant to

the New Jersey Casino Control Act (the "Act") as a result of the Commission's appointment of

retired New Jersey State Supreme Court Justice Gary S. Stein ("Justice Stein") as conservator of

all the assets of Adamar on December 19, 2007.

2.      After more than sixteen months of extensive marketing efforts, the Debtors and

Justice Stein entered into a credit bid asset purchase agreement with the Debtors' pre-petition

secured lenders, which served as the "stalking horse" bid for the solicitation of higher and better

offers for the Debtors' assets.  The Debtors did not receive any other offers for their assets and,

following Bankruptcy Court approval of the sale and the asset purchase agreement, as amended,

closed on the sale of their assets to Tropicana Atlantic City Corp. and Tropicana AC Sub Corp.

(collectively, the "Specified Parties" or the "Purchasers") on March 8, 2010 pursuant to the

Amended Agreement.

3.      As demonstrated herein, the Debtors have satisfied and/or otherwise resolved all

claims that are payable under the Amended Agreement, other than the Professional

Compensation Claims (as defined below), which will be paid upon entry of a Bankruptcy Court

order allowing same.  Additionally, the Debtors have no remaining assets to monetize for the

benefit of their creditors and, therefore, do not have the means with which to pay priority

unsecured liabilities other than those already paid under the Amended Agreement or to fund a

dividend to general unsecured creditors.  As a result, the Debtors are unable to propose a Chapter

11 plan that satisfies the confirmation requirements of the Bankruptcy Code.  Accordingly,

dismissal of these cases pursuant to Sections 1112(b), 105(a) and 305(a) of the Bankruptcy Code

45961/0001-7523116v5

is appropriate, and represents the most efficient and expedient route for bringing these cases to

conclusion.

4.      For the reasons set forth herein, the Debtors' Chapter 11 cases should be

dismissed.

## II.      INTRODUCTION AND JURISDICTION

5.      This Application is submitted in support of the Debtors' motion for an Order

pursuant to Sections 1112(b), 105(a) and 305(a) of Chapter 11 of Title 11 of the United States

Code (the "Bankruptcy Code") dismissing their bankruptcy cases and granting related relief (the

"Motion").

6.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334 and

157(b).

7.      This is a "core" proceeding pursuant to 28 U.S.C. §§ 157(b)(A) and (O).

8.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## II.      BACKGROUND

### A.      The Chapter 11 Filings

9.      On April 29, 2009 (the "Filing Date"), the Debtors filed voluntary petitions for

relief pursuant to Chapter 11 of the Bankruptcy Code.  From the Filing Date until the Closing (as

defined below), the Debtors remained in possession of their assets and continued in the

management of their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of

the Bankruptcy Code.

10.     The Office of the United States Trustee for the District of New Jersey ("UST")

did not appoint an Official Committee of Unsecured Creditors in these cases.

11.     A detailed description of the Debtors' business and the facts precipitating the

filing of their Chapter 11 proceedings are set forth in the Affidavit of Mark Giannantonio in

3

support of the Debtors' various "First Day Motions" [Docket No. 19] (the "Giannantonio

Affidavit").  Those facts are incorporated herein by reference.

12.     As set forth in the Giannantonio Affidavit, as of the Filing Date, the Debtors were

in the hotel and gaming business and owned and operated one of the largest and most established

destination casino resorts in Atlantic City, New Jersey, known as the Tropicana Casino and

Resort -  Atlantic City (the "Trop AC").

13.     As of the Filing Date, Adamar was subject to: (i) an October 2006 Interim Casino

Authorization Trust Agreement that appointed Justice Stein as trustee for the stock of Adamar,

which trust became "operative" December 12, 2007 following denial of the application of

Tropicana Casinos and Resorts, Inc. for plenary qualification as a holding company of Adamar;

and (ii) the December 19, 2007 Order (the "Conservator Order") of the Commission appointing

Justice Stein as conservator of all the assets of Adamar following the Commission's denial of

Adamar's license renewal on December 12, 2007.  The Conservator Order, pursuant to N.J.S.A.

§ 5:12-95.14(e), required Justice Stein to dispose of all the equity or assets of Adamar.

14.     Before Justice Stein's appointment, Adamar was an indirect subsidiary of Aztar

Corporation ("Aztar").  Aztar, in turn, was a direct subsidiary of Tropicana Entertainment, LLC

("TE"), which, together with Aztar and other affiliated entities (collectively, the "TE Debtors"),

are jointly administered debtors in the United States Bankruptcy Court for the District of

Delaware bearing Case No. 08-10856 (KJC) (jointly administered).  As further described in the

Giannantonio Affidavit, the Aztar Acquisition (as defined in the Giannantonio Affidavit) was

financed, in part, through a $1.71 billion secured credit facility (the "OpCo Credit Facility")

provided to TE (f/k/a Wimar OpCo LLC), Wimar OpCo Intermediate Holdings LLC and certain

other TE Debtors (collectively, the "TE Borrowers") by the lenders (the "OpCo Lenders") from

time to time party to a certain Credit Agreement dated January 3, 2007 (as amended,

supplemented or otherwise modified, the "OpCo Credit Agreement").  Credit Suisse was the

administrative agent and collateral agent under the OpCo Credit Facility (in such capacities, the

"OpCo Agent").  Pursuant to that certain Guarantee and Collateral Agreement dated January 3,

2007 (as amended, supplemented or otherwise modified), the Debtors guaranteed repayment of

the TE Borrowers' obligations under the OpCo Credit Facility and granted the OpCo Agent, for

the benefit of the OpCo Lenders, a properly perfected, first priority security interest in

substantially all their assets, including cash and cash equivalents, to secure their obligations

under such guaranty.  As a result, as of the Filing Date, the Debtors acknowledged the extent,

validity and priority of the OpCo Agent's liens on their assets, including cash and cash

equivalents.  See, e.g., Cash Collateral Order, Docket No. 135, ¶¶ 5(b), 7 and 10(a) (holding that

the lenders had valid prepetition and adequate protection liens on all the Debtors' cash and cash

collateral, defined to include "[t]he Debtors' cash, including all cash and other amounts on

deposit or maintained in any account subject to a control agreement with the Prepetition Agent

and any proceeds of the Prepetition Collateral").

15.      As of the Filing Date, the total amount outstanding under the OpCo Credit

Facility was approximately $1.38 billion.

**B.      The Sale of the Debtors' Assets**

16.      Following his appointment, Justice Stein undertook a comprehensive and

extensive effort to sell the Debtors' assets, all as more detailed in the Sale Motion (as defined

below).  Unfortunately, no definitive commitments from financial, strategic or other third party

purchasers were received and, as a result, the Debtors and Justice Stein negotiated and entered

into a credit bid asset purchase agreement with the OpCo Agent on behalf of the OpCo Lenders.

45961/0001-7523116v5

17.     On April 30, 2009, the Debtors filed a Motion Pursuant to 11 U.S.C. §§ 363, 365 and 1113 and Fed. R. Bankr. P. 2002, 6004 and 6006 for an Order: (1) Approving "Stalking Horse" Asset Purchase Agreement (the "Original Agreement") for the Sale of Substantially All the Debtors' Assets; (2) Approving Bidding Procedures and Form, Manner and Sufficiency of Notice; (3) Scheduling (A) an Auction Sale and (B) a Hearing to Consider Approving the Highest and Best Offer; (4) Authorizing the Debtors to Sell Substantially All Their Assets Free and Clear of Liens, Claims, Encumbrances, and Interests and to Assume and Assign Certain Related Executory Contracts, Unexpired Leases and Collective Bargaining Agreements; and (5) Granting Other Related Relief [Docket No. 41] (the "Sale Motion").  On June 12, 2009, this Court entered an Order, among other things, approving the Original Agreement and authorizing the Debtors to sell substantially all their assets in accordance therewith [Docket No. 216] (the "Original Sale Order").

18.     Shortly after the Original Sale Order was entered, the steering committee for the Secured Parties (as defined in the Amended Agreement) requested that the Debtors and the various other non-debtor selling parties amend and restate the Original Agreement to effectuate a "G-Reorganization" pursuant to Section 368(a)(1)(G) of the Internal Revenue Code.  Following extensive negotiations, the parties agreed upon an Amended and Restated Purchase Agreement.

19.     On October 7, 2009, the Debtors filed a Motion pursuant to 11 U.S.C. §§ 105, 363 and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, 7062, 9007 and 9014 for an Order: (1) Approving Amended and Restated Purchase Agreement (the "Agreement") and Sale of Substantially All the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; (2) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (3) Granting Other Related Relief [Docket No. 440].  On November 4,

2009, this Court entered an Order, among other things, approving the Agreement [Docket No.

496] (the "Sale Order").

20.     On February 10, 2010, the parties executed an amendment to the Agreement (the

"Amendment" and, together with the Agreement, the "Amended Agreement").

21.     On March 8, 2010, the closing on the Amended Agreement (the "Closing")

occurred and the Specified Parties acquired, through a credit bid, all the Debtors' assets free and

clear of any and all liens, claims, encumbrances and interests of any and every kind and nature

whatsoever, including all the Debtors' cash and cash equivalents.

### (i)     Executory Contracts and Unexpired Leases

22.     Pursuant to the Sale Order and Amended Agreement, many of the Debtors'

unexpired leases and executory contracts were assumed and assigned to the Specified Parties.

Each of the Debtors' unexpired leases and executory contracts that were not assumed and

assigned to the Specified Parties have been rejected by the Debtors pursuant to the: (a) Motion

for an Order Authorizing the Debtors to Reject Certain Unexpired Non-Residential Real Property

Leases Pursuant to 11 U.S.C. § 365(a) Effective as of June 30, 2009 [Docket No. 231], (b)

Motion for an Order Authorizing the Debtors to Reject Certain Unexpired Slot Leases with

Atronic Americas, LLC Pursuant to 11 U.S.C. § 365(a) Effective as of July 31, 2009 [Docket

No. 327], (c) Motion for an Order Authorizing the Debtors to Reject Simulcast Agreements

Pursuant to 11 U.S.C. § 365(a) Effective as of the Date of the New Jersey Casino Control

Commission's Order Approving Closure of their Simulcasting Facility [Docket No. 607], (d)

First Motion for Entry of an Order Authorizing the Debtors to Reject Certain Executory

Contracts Pursuant to 11 U.S.C. § 365(a) *Nunc Pro Tunc* [Docket No. 694]; and (e) Second

Motion for Entry of an Order Authorizing the Debtors to Reject Certain Executory Contracts

Pursuant to 11 U.S.C. § 365(a) *Nunc Pro Tunc* [Docket No. 727].

7

### (ii)  Assumption of Liabilities and Payments from Cash On Hand
at Closing[2]

23.     Pursuant to Section 2.1(c) of the Amended Agreement, the Specified Parties

agreed to assume certain liabilities of the Debtors, defined as all Liabilities (a) first arising after

the Closing, arising out of or relating to the Acquired Contracts, (b) first arising after the

Closing, under any lease covering Leased Personal Property, (c) for post-petition ordinary course

obligations and trade payables of the Business as of the Closing that are Allowed administrative

expenses under Section 503(b) of the Bankruptcy Code, (d) for Allowed administrative expenses

under Section 503(b)(9) of the Bankruptcy Code, (e) with respect to pre-petition operating

Liabilities of the Business in the amounts set forth on the Closing Certificate (the "Specified Pre-

Petition Operating Liabilities"), (f) for Taxes set forth on Exhibit B to the Amended Agreement

to the extent such Liabilities are Allowed administrative expense Claims arising out of or related

to the Acquired Assets of the Business and to the extent provided in Sections 6.8(a), 6.8(c) and

6.8(d) of the Amended Agreement, and (g) relating to the Business Employees or arising under

Benefit Plans, but in each case only to the extent expressly assumed by the Specified Parties

under Section 6.3 of the Amended Agreement (collectively, the "Assumed Liabilities").  The

Specified Parties did not assume and, therefore, the Debtors retained any and all Liabilities other

than the Assumed Liabilities, including those listed in Section 2.1(d)(i)-(vii) of the Amended

Agreement.

---

[2] All capitalized terms used but not otherwise defined in Section II.B(ii) herein shall have
the same meanings ascribed to them in the Amended Agreement.  This Section II.B(ii) is only a
summary of the provisions of the Amended Agreement referenced herein.  The terms of the
Amended Agreement shall govern, and the reader is urged to consult the Amended Agreement
for the complete contents of its terms.

8

24.     In addition, the Specified Parties agreed to pay from the cash they purchased, and on which the OpCo Lenders previously held a valid lien, certain expressly enumerated liabilities of the Debtors listed on the Closing Certificate regarding: (a) unpaid fees and expenses of the Trustee/Conservator and professionals retained by the Trustee/Conservator as of the Closing, (b) amounts due and owing under the Management Agreements, (c) amounts due and owing for Approval Payments at the Closing or as a result of the Closing, (d) priority Claims payable to current and former employees under Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code listed on the Closing Certificate in an aggregate amount not to exceed $500,000, (e) other administrative expenses under Sections 503(b) and 507(a) of the Bankruptcy Code that are not Assumed Liabilities, (f) fines and penalties due and payable to the Commission as of the Closing, and (g) priority claims for or relating to Taxes for which Justice Stein or the directors, officers or employees of the Debtors would reasonably be expected to be subject to personal liability under applicable law.  See Amended Agreement, § 3.2(a).

25.     The funds necessary to satisfy payment of the claims listed on the Closing Certificate were either held by the Specified Parties, or were escrowed by the Specified Parties with Cole, Schotz, Meisel, Forman & Leonard, P.A., as escrow agent ("Cole Schotz" or the "Escrow Agent"), in an escrow account (the "Escrow"), pursuant to that certain Escrow Agent and Disbursement Agent Agreement dated March 8, 2010 (the "Escrow Agreement").

## C.     Administrative Expense Liabilities Under Section 503 of the Bankruptcy Code

26.     At the first day hearing held on May 1, 2009, the Debtors advised the Court that as a result of their negotiations with the OpCo Lenders, the Debtors' estates would remain administratively solvent throughout these Chapter 11 proceedings even though substantially all

45961/0001-7523116v5

the Debtors' assets were being sold.[3]  Indeed, all allowed administrative expense claims either

have been expressly assumed by the Purchasers under Section 2.1(c) of the Amended

Agreement, or as to those listed on the Closing Certificate, have been paid (other than

Professional Compensation Claims) with the cash purchased by the Specified Parties pursuant to

the terms of the Amended Agreement.

### (i)    Allowed Section 503(b)(9) Claims

27.    On May 27, 2009, this Court entered an Order (the "Section 503(b)(9)

Administrative Expense Claims Bar Date Order") Fixing a Bar Date for Filing Proofs of Claim

Including Administrative Expense Claims Pursuant to Section 503(b)(9), Approving the Form

and Manner of Notice Thereof and Approving the Section 503(b)(9) Proof of Claim Form

[Docket No. 141].  Pursuant to the Section 503(b)(9) Administrative Expense Claims Bar Date

Order, among other things, the Court fixed July 17, 2009 (the "Section 503(b)(9) Administrative

Expense Claims Bar Date") as the last date for claimants to file administrative expense claims

under 11 U.S.C. § 503(b)(9) (a "Section 503(b)(9) Administrative Expense Claim").

28.    On May 29, 2009, the Debtors' noticing, claims and balloting agent, Kurtzman

Carson Consultants LLC ("KCC"), gave notice of the Section 503(b)(9) Administrative Expense

Claims Bar Date by mailing to all entities known or reasonably ascertainable as potential holders

of Section 503(b)(9) Administrative Expense Claims (i) a notice of the Section 503(b)(9)

Administrative Expense Claims Bar Date (the "Section 503(b)(9) Administrative Expense

Claims Bar Date Notice"), (ii) the Section 503(b)(9) Administrative Expense Claims Bar Date

---

[3] Under the asset purchase agreement, . . . the lenders have agreed to allow the debtor and
the debtor's estate to satisfy certain enumerated obligations which are set forth in section 3.2 of
the agreement from the cash on hand, and those obligations include . . . all administrative claims
. . . ." See First Day Hearing Transcript, 43:19-25 (May 1, 2009).

Order and (ii) a proof of Section 503(b)(9) Administrative Expense Claim form (the "Section

503(b)(9) Proof of Claim Form").

29.    On June 3, 2009, KCC filed a Certificate of Service with respect to the mailing of

the Section 503(b)(9) Administrative Expense Claims Bar Date Notice and other materials

described in Paragraph 28 above [Docket No. 172].  On or about June 4, 2009, the Debtors

published the Section 503(b)(9) Administrative Expense Claims Bar Date Notice in the *The*

*Press of Atlantic City*, *The Courier Post*, *The Newark Star Ledger*, and *The Philadelphia*

*Inquirer* in accordance with the Section 503(b)(9) Administrative Expense Claims Bar Date

Order.  On June 16, 2009, the Debtors filed Affidavits of Publication for the aforementioned

newspapers at Docket Nos. 227, 228, 229 and 230, respectively.

30.    The Debtors reviewed the filed Section 503(b)(9) Administrative Expense Claims

to determine which claims should be allowed, reduced or expunged on the basis that such claims

have no legal basis and/or do not comport with their books and records.

31.    Based on the Debtors' review of those claims, on November 12, 2009, the

Debtors filed their First Omnibus Objection (Substantive) pursuant to Sections 502(b) and

503(b)(9) of the Bankruptcy Code and Bankruptcy Rules 3001 and 3007 granting the Debtors'

First Omnibus Objection (Substantive) to certain Section 503(b)(9) Administrative Expense

Claims.  On December 31, 2009, the Court entered an Order granting the First Omnibus

Objection [Docket No. 627] (the "First Omnibus Objection Order").  Based on the Debtors'

information and belief, formed after reasonably inquiry, all Section 503(b)(9) claims filed and

not expunged by the First Omnibus Objection Order have been fully satisfied by the Specified

Parties.

        **(ii)**       **Allowed Administrative Expense Claims Under Section 503(b)(1)(A)
of the Bankruptcy Code for the Post-Petition Supply of Goods and
Services**

32.     On November 25, 2009, the Court entered an Order: (I) Establishing a Bar Date

for Filing Certain Chapter 11 Administrative Expense Claims; (II) Approving Form, Manner and

Sufficiency of Notice Thereof; and (III) Approving Proof of Administrative Expense Claim

Form [Docket No. 557] (the "Administrative Claims Bar Date Order"), pursuant to which,

among other things, the Court fixed 45 days from the Closing (the "Administrative Claims Bar

Date") as the last date for claimants to file administrative expense claims under Section 503(b) of

the Bankruptcy Code.  Given the Closing occurred on March 8, 2010, April 22, 2010 became the

Administrative Claims Bar Date.

33.     Pursuant to the Administrative Claims Bar Date Order, KCC was required to give

notice of the Administrative Claims Bar Date by mailing to all entities known or reasonably

ascertainable as potential holders of administrative claims (i) a notice of the Administrative

Claims Bar Date (the "Administrative Claim Bar Date Notice"), (ii) the Administrative Claim

Bar Date Order and (iii) a proof of administrative claim form (the "Proof of Administrative

Claim Form") within 3 days of the Closing (i.e., March 11, 2010).

34.     Furthermore, pursuant to the Administrative Claims Bar Date Order, in

accordance with Rule 2002(*l*) of the Federal Rules of Bankruptcy Procedure, the Debtors were

required to publish the Administrative Claims Bar Date Notice in the *The Press of Atlantic City*

on one occasion at least thirty (30) days before the Administrative Claims Bar Date.  On March

12, 2010, KCC filed a Certificate of Service with respect to the mailing of the Administrative

Claims Bar Date Notice and other materials described in Paragraph 33 above on March 11, 2010

[Docket No. 763].  On March 11, 2010, the Debtors caused to be published the Administrative

Claims Bar Date Notice in *The Press of Atlantic City* in accordance with the Administrative

Claims Bar Date Order.  On March 18, 2010, the Debtors filed an Affidavit of Publication with

respect to same [Docket No. 776].

35.     The Debtors' notice by publication of the Administrative Claims Bar Date Order

was proper and sufficient to provide notice of the Administrative Claims Bar Date to unknown

creditors.  See Chemetron Corp. v. Jones, 72 F.3d 341, 346 (3d Cir. 1995); In re Trump Taj

Mahal Assocs., 156 B.R. 928, 932 (Bankr. D.N.J. 1993).

36.     The Debtors and their attorneys and financial advisors reviewed all filed

administrative claims and compared them with the Debtors' books and records.  Based upon

such review, the Debtors filed their: (i) Fourth Omnibus Objection (Substantive) pursuant to

Sections 502(b) and 503 of the Bankruptcy Code and Bankruptcy Rule 3007 to certain

administrative expense claims on the grounds that they were (a) satisfied, (b) improperly

classified, (c) withdrawn or settled, or (d) contain insufficient information; (ii) Fifth Omnibus

Objection (Substantive) pursuant to Sections 502(b) and 503 of the Bankruptcy Code and

Bankruptcy Rule 3007 to certain administrative expense claims on the grounds that they were (a)

satisfied, (b) withdrawn or settled, or (c) improperly classified; and (iii) Sixth Omnibus

Objection (Substantive) pursuant to Sections 502(b) and 503 of the Bankruptcy Code and

Bankruptcy Rule 3007 to certain administrative expense claims on the grounds that they were

improperly classified, and/or should be disallowed.  The Court granted the Fourth, Fifth and

Sixth Omnibus Objections [Docket Nos. 938, 957 and 1041, respectively].

37.     Accordingly, all claims for post-petition ordinary course obligations and trade

payables as of the Closing filed pursuant to Section 503(b) of the Bankruptcy Code (with the

45961/0001-7523116v5

exception of the Professional Compensation Claims (as defined below)), and not expunged by

the Orders granting the Fourth, Fifth and Sixth Omnibus Objections, have been satisfied.

> **(iii)    Administrative Expense Claims Under Section 503(b)(2) of the
> Bankruptcy Code For Professional Services**

38.    On June 25, 2010, Levine, Staller, Sklar, Chan, Brown & Donnelly, P.A., Cooper

Levenson April Niedelman & Wagenheim and Fox Rothschild LLP filed final applications for

allowance of compensation for professional services rendered on the Debtors' behalf and

reimbursement of actual and necessary expenses incurred pursuant to Sections 328 and 330 of

the Bankruptcy Code.  On July 27, 2010, the Court entered Orders approving those final fee

applications [Docket Nos. 934, 935 and 936, respectively] and those professionals were paid

from the Escrow.

39.    On June 25, 2010, Debevoise & Plimpton LLP ("Debevoise"), as special

corporate counsel to the Debtors, filed a final application for allowance of compensation for

professional services rendered and reimbursement of actual and necessary expenses incurred

pursuant to Sections 328 and 330 of the Bankruptcy Code.  On September 8, 2010, the Court

entered an Order approving Debevoise's final fee application [Docket Nos. 965] and Debevoise

was paid from the Escrow.

40.    On September 22, 2010, Ernst & Young LLP ("E&Y"), as auditors to the

Debtors, filed a final application for allowance of compensation for professional services

rendered and reimbursement of actual and necessary expenses incurred pursuant to Sections 328

and 330 of the Bankruptcy Code.  On October 26, 2010, the Court entered an Order approving

E&Y's final fee application [Docket Nos. 1011] and E&Y was paid from the Escrow.

41.    The remaining professionals engaged by the Debtors during these Chapter 11

cases are Cole Schotz, Pashman Stein P.C. and J.H. Cohn LLP (the "Remaining Professionals").

Pursuant to the proposed form of Order dismissing these cases, it is contemplated that the

Remaining Professionals will file their final fee applications for services rendered and costs

incurred (the "Professional Compensation Claims") within thirty (30) days of the entry of an

Order granting the Motion.

42.    After payment of all allowed fees and costs on account of Professional

Compensation Claims, unpaid and accrued UST quarterly fees as well as unpaid, undisputed and

accrued invoices from KCC from the Escrow, the Escrow Agent shall return the balance of the

Escrow to the Specified Parties.[4]  Additionally, all retainers received from the Debtors prior to

the Filing Date shall be returned to the Specified Parties at that time.

**(iv)    The Remaining Administrative Expense Claims Filed Against the
Debtors' Estates Pursuant to Section 503(b) of the Bankruptcy Code**

43.    The administrative claims asserted against the Debtors' estates under Section

503(b) of the Bankruptcy Code not adjudicated pursuant to the Fourth, Fifth and Sixth Omnibus

Objections (with the exception of the Professional Compensation Claims) are: (i) Claim No. 760

filed by the Division of Gaming Enforcement ("DGE") relating to Docket No. 10-0109-VC for

improper slot voucher deletion; (ii) Claim No. 761 filed by the DGE relating to Docket No. 09-

0424-VC for improper surveillance equipment; (iii) Claim No. 762 filed by the DGE relating to

Docket No. 10-0109-VC for a slot link violation and improper progressive link controller; (iv)

Claim No. 763 filed by the DGE relating to Docket No. 09-0728-VC for a rules of the game

violation; (v) Claim No. 790 filed by UNITE HERE Local 54 (the "Local 54") relating to

Grievance No. 20100395 with respect to the termination of a covered employee; (vi) Claim No.

---

[4] Provided, however, that $10,000.00 shall be reserved for the costs associated with
dissolving Adamar of NJ In Liquidation, LLC under applicable state laws.  Further, to the extent
a dispute exists as to the unpaid and accrued invoices of KCC, the Escrow Agent shall reserve an
amount necessary to satisfy the disputed invoices until such time as the dispute is resolved.

45961/0001-7523116v5

791 filed by the Local 54 relating to Grievance No. 20100393 with respect to the termination of a

covered employee; (vii) Claim No. 793 filed by the Local 54 relating to Grievance No. 20091286

with respect to job duties and pay issues of a covered employee; (viii) Claim No. 795 filed by the

Local 54 relating to Grievance Nos. 20091582, 20091574, 20091581, 20091570, and 20091575

with respect to termination of five covered employees; (ix) Claim No. 779 filed by UNITE

HERE National Retirement Fund (the "Fund") for withdrawal liability; and (x) Claim No. 794

filed by Columbia Sussex Corporation for reimbursement of insurance losses and associated

premiums.

44.     Claim Nos. 760, 761, 762 and 763 filed by the DGE have been withdrawn

[Docket Nos. 1079 and 1102] or resolved by way of stipulation and consent order [Docket No.

1120].  Claim Nos. 790, 791, 793 and 795 filed by the Local 54 also have been withdrawn.  In

addition, Claim No. 779 filed by the Fund has been withdrawn [Docket No. 1107].

45.     Additionally, on April 18, 2011, the Debtors filed a motion for an Order pursuant

to Sections 502(b) and 503 of the Bankruptcy Code and Rule 3007 of the Federal Rules of

Bankruptcy Procedure to disallow and reclassify Claim No. 794 filed by Columbia Sussex

Corporation as an administrative expense claim (the "Columbia Sussex Motion").  For the

reasons set forth in the Columbia Sussex Motion, there is no basis in fact or in law to allow

Columbia Sussex Corporation an administrative expense claim and, therefore, the Debtors

believe the Columbia Sussex Motion will be granted.  In the event the Columbia Sussex Motion

is not granted on the currently scheduled return date of May 18, 2011, the Debtors reserve the

right to seek an adjournment, if necessary, of this Motion to give them an opportunity to litigate

the priority, extent and validity of Claim No. 794 to conclusion.

45961/0001-7523116v5

### (v)    Post-Petition Personal Injury Incidents

46.    After the Administrative Claims Bar Date, certain individuals or their counsel have inquired about the filing of administrative expense claims for personal injury incidents that allegedly occurred at the Trop AC between the Filing Date and the Closing (the "Post-Petition Personal Injury Incidents").

47.    As set forth in the Giannantonio Affidavit, the Trop AC is one of the largest destination casino resorts in Atlantic City, New Jersey.  The Trop AC has 2,129 hotel rooms, spans four city blocks and is situated on approximately 14 acres of land, with 220 yards of ocean frontage on the Atlantic City Boardwalk.  The Trop AC houses one of the largest and most successful offerings of premier dining, retail and non-gaming entertainment alternatives in Atlantic City in "The Quarter," its 200,000 square foot retail, dining and entertainment complex. The Quarter offers nine upscale restaurants and nightclubs with seating for over 3,000 guests, more than two dozen retail establishments, an IMAX theater, a comedy club, and a Blue Mercury Spa, one of the fastest growing luxury spa chains in the United States.  Additionally, the Trop AC offers approximately 122,000 square feet of convention space, making it one of the largest providers of meeting facilities in Atlantic City.

48.    The Trop AC draws approximately 4 million customer visits annually, or an average of over 10,000 visitors per day.  Given the vast size of the Trop AC and the substantial number of customers that patronize it per day, it is not surprising that the Debtors receive customer complaints in the ordinary course of business on a daily basis.  Those complaints range from general unhappiness with the Debtors' service and/or accommodations to an injury that allegedly occurred at the property.  Customers who lodge a complaint are requested to complete an "incident report."  On average, 4,000 incident reports are filed per year.  Incident reports, in

17

turn, are transmitted to the Debtors' internal risk management team ("Risk Management") for assessment and handling. The Risk Management team -- contrary to its title -- is not comprised of any Trop AC management, executives, officers, or directors. Risk Management has authority to settle grievances only up to $5,000 in cash or complimentary services. If Risk Management cannot resolve an incident for less than $5,000 in cash or complimentary services, it makes no further effort to resolve the incident. Also, if Risk Management does not believe it could, without contacting the claimant, resolve the incident for less than $5,000 in cash or complimentary services, it makes no attempt to do so. Instead, the incidents lay dormant until suit is filed.

49.    The Debtors have reviewed the facts and circumstances surrounding the Post-Petition Personal Injury Incidents, and believe those individuals were unknown creditors as of the Closing.[5] That is because no actions were taken by these individuals prior to the Closing that would elevate their purported claims to something more than "speculative and conjectural." E.g., Trump Taj Mahal, 156 B.R. at 932. Notice by publication of the Administrative Claims Bar Date to these unknown creditors was sufficient under applicable case law. See, e.g., Chemetron Corp. v. Jones, 72 F.3d at 346; Trump Taj Mahal, 156 B.R. at 932. Because these unknown creditors failed to timely file a proof of administrative claim, any liability the Debtors might have had in connection therewith is forever barred and discharged pursuant to the Administrative Claims Bar Date Order.[6]

---

[5] With one caveat, Mr. Chappas filed a lawsuit against the Debtors post-petition. He is therefore excluded from the discussion of Post Petition Personal Injury incidents herein.

[6] The Administrative Claims Bar Date Order provides that any claimant allegedly holding an Administrative Expense Claim that failed to file a Proof of Administrative Claim Form before the Administrative Claims Bar Date "shall be barred, estopped and enjoined from asserting an Administrative Expense Claim against the Debtors or their estates."

45961/0001-7523116v5

### D.    Unsecured Priority Claims Under Section 507 of the Bankruptcy Code

50.    Pursuant to the Amended Agreement, the Purchasers agreed to satisfy only those allowed priority claims: (i) filed by or on behalf of current and former employees under Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code set forth on the Closing Certificate in an aggregate amount not to exceed $500,000; and (ii) for or relating to Taxes (as defined in the Amended Agreement) for which Justice Stein or the directors, officers or employees of the Debtors would reasonably be expected to be subject to personal liability under applicable law (collectively, the "Priority Claims").  The Priority Claims have been satisfied.

### (i)    Priority Claims Filed By Or On Behalf of Current and Former Employees Under Section 507(a)(4) and 507(a)(5) of the Bankruptcy Code

51.    On May 1, 2009, the Court entered an Order: (I) Authorizing the Debtors to (A) Satisfy and, to the Extent Applicable, Directing Any Payroll Banks to Honor, Pre-Petition Gross Salaries, Payroll Taxes and Related Obligations to or for the Benefit of the Debtors' Employees, and (B) Honor, in Their Discretion, Prepetition Sick, Vacation, Personal, and Similar Themed Days; and (II) Granting Other Related Relief [Docket No. 51] (the "Employee Benefits Order").  Pursuant to the Employee Benefits Order, the Debtors satisfied all prepetition wages of their then employees, to the extent then outstanding, and were authorized to continue honoring their pre-petition employee benefit policy (the "Employee Policy") in the ordinary course of business after the Filing Date.  The Employee Policy delineated, among other things, the personal days, sick time, sick-vacation and vacation days, and other employee benefits for the Debtors' then employees.

52.    Consistent with the Employee Policy and based upon a review of the Debtors' books and records, on April 9, 2010, the Debtors filed a motion for an Order pursuant to Sections

45961/0001-7523116v5

502(b), 507(a)(4) and 507(a)(5) of the Bankruptcy Code and Bankruptcy Rule 3007 granting the

Debtors' Third Omnibus Objection (Substantive) to certain invalid priority claims filed by or on

behalf of current and former employees.

53.    On May 19, 2010, the Court entered an order granting the Debtors' Third

Omnibus Objection [Docket No. 885].  Accordingly, all filed priority proofs of claim of the

Debtors' current and former employees under Sections 507(a)(4) and 507(a)(5) of the

Bankruptcy Code were either satisfied pursuant to the Employee Benefits Order or expunged by

the Order granting the Third Omnibus Objection.

> (ii)    **Priority Tax Claims Filed by the State of New Jersey, Division of Taxation Under Section 507(a)(8) of the Bankruptcy Code**

54.    The State of New Jersey has filed the following claims against the Debtors'

estates by or on behalf of the Division of Taxation and the Department of Labor and Workforce

Development (collectively, the "Division"):

> (a) A priority unsecured proof of claim against Adamar in the amount of $14,800,000, designated as claim no. 710 on the claims register ("Claim No. 710");
>
> (b) A general unsecured proof of claim against Adamar in the amount of $49,000,000, designated as claim no. 711 on the claims register ("Claim No. 711").
>
> (c) An amended priority unsecured claim against Adamar, designated claim no. 732 on the claims register, in the amount of $15,074,218.93 ("Claim No. 732");
>
> (d) A second amended priority unsecured claim against Adamar, designated claim no. 804 on the claims register, in the amount of $17,196,541.12, which consists of: (i) $16,924,065.39 related to an audit of corporate business taxes allegedly owed for the period January 1, 2006 through and including December 31, 2008 (the "Priority CBT Claim"); (ii) $236,832.60 related to an audit of sales and use taxes allegedly owed for the period January 1, 2007 through and including June 30, 2009 (the "Sales and Use Taxes"); and (iii) $35,643.13 related to an audit of Atlantic City luxury sales taxes allegedly owed for the period January 1, 2007 through and

20

including June 30, 2009 (the "Luxury Sales Taxes," and, together with the Sales and Use Taxes, the "Potential Personal Liability Taxes") (collectively, "Claim No. 804"); and

(e) A first amended general unsecured proof of claim designated as claim no. 806 on the claims register in the amount of $84,998,552.64 ("Claim No. 806"). Claim No. 806 amended and superseded Claim No. 711 in its entirety.

55.     In addition, on December 30, 2009, the Debtors received a Notice of Assessment Related to a Final Audit Determination (the "Notice of Assessment"), in which the Division alleges that Adamar is liable for corporate business taxes related to an audit for the period January 1, 1995 through and including December 31, 2007.

56.     On August 27, 2010, the Debtors filed a motion pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 for entry of an Order: (i) allowing the Potential Personal Liability Taxes asserted in Claim No. 804 in the amount of $320,283.44; and (ii) disallowing and expunging Claim No. 710 and Claim No. 732 filed by the Division, as those claims had been amended and superseded in their entirety by Claim No. 804 [Docket No. 957] (the "Potential Personal Liability Taxes Motion").

57.     The Potential Personal Liability Taxes Motion was granted by order of this Court on October 20, 2010 [Docket No. 1000] (the "Potential Personal Liability Taxes Order"). Pursuant to the Potential Personal Liability Taxes Order, (a) the Potential Personal Liability Taxes portion of Claim No. 804 was allowed in the amount of $320,283.44, and (b) Claim No. 710 and Claim No. 732 were expunged as having been amended and superseded in their entirety by Claim No. 804.[7]

---

[7] On November 5, 2010, the Debtors issued payment in the amount of $320,283.44 to the State of New Jersey in accordance with the Potential Personal Liability Taxes Order.

58.    On October 19, 2010, the Division filed a motion  (the "Division's Allowance

Motion") to allow and/or fix the Division's claims, which seeks, inter alia, allowance of Claim

No. 720, Claim No. 804 and Claim No. 806 (the "Division's Claims").  Although the Division is

fully aware of the fact that the Debtors do not have any funds to pay any claims that may be

allowed pursuant to the Divisions' Allowance Motion, and acknowledges that the Purchaser is

not liable for the Divisions' Claims, the Division is insisting on the allowance of the Division's

Claims.  The hearing on the Division's Allowance Motion is scheduled for May 18, 2011.

### E.    Remaining Priority Unsecured Claims

59.    The Debtors do not have any funds with which to satisfy remaining priority

unsecured claims (the "Remaining Priority Unsecured Claims").[8]  Moreover, pursuant to the

Amended Agreement, the Purchasers acquired the Debtors' assets free and clear of all liens,

claims, encumbrances and interests and were not responsible for the Remaining Priority

Unsecured Claims.

### F.    General Unsecured Liabilities

60.    The Debtors do not have any funds with which to satisfy any general unsecured

claims (the "General Unsecured Claims").[9]  Moreover, pursuant to the Amended Agreement, the

Purchasers acquired the Debtors' assets free and clear of all liens, claims, encumbrances and

interests and were not responsible for the General Unsecured Claims (except for the Specified

Pre-Petition Operating Liabilities).

---

[8] Attached as Exhibit A to the proposed Order granting the Motion is a list of remaining
known priority unsecured claims based on creditors listed on Schedule E of the Debtors'
schedules of liabilities and filed claims as of the bar date set in these cases.

[9] Attached as Exhibit B to the proposed Order granting the Motion is a list of known
general unsecured claims based on creditors listed on Schedule F of the Debtors' schedules of
liabilities and filed claims as of the general unsecured bar date set in these cases.

22

## III.   **RELIEF REQUESTED AND BASIS THEREFOR**

### A.   **This Court Should Dismiss the Debtors' Bankruptcy Cases For "Cause" Under 11 U.S.C. § 1112(b)**

61.   Pursuant to Section 1112(b)(1) of the Bankruptcy Code, absent unusual circumstances, the Court **shall** dismiss a bankruptcy case "for cause."[10]  The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") changed the statutory language with respect to conversion and dismissal such that now, upon a finding of "cause," the Court **must** dismiss or convert a Chapter 11 case absent unusual circumstances.[11]  In re Gateway Access Solutions, Inc., 374 B.R. 556 (Bankr. M.D.Pa. 2007) (the amendments to § 1112 limit the court's discretion to refuse to dismiss or convert a Chapter 11 case upon a finding of cause); In re TCR of Denver, LLC 338 B.R. 494, 498 (Bankr. D. Colo. 2006) ("Congress has purposefully limited the role of this Court in deciding issues of conversion or dismissal such that this Court

---

[10] Section 1112(b)(1) states, in pertinent part:

> on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court **shall** convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

11 U.S.C. § 1112(b)(1) (emphasis added).

[11] Before BAPCPA, a bankruptcy court had wide discretion to use its equitable powers to dispose of a debtor's case but was not mandated to dismiss a case if cause were shown. H.R.Rep. No. 595, 95th Cong., 1st Sess. 405 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 117 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787; see also Small Business Admin. v. Preferred Door Co. (In re Preferred Door Co.), 990 F.2d 547, 549 (10th Cir. 1993) (a court has broad discretion to dismiss a bankruptcy case); In re Sullivan Cent. Plaza I, Ltd., 935 F.2d 723, 728 (5th Cir. 1991) (determination of whether cause exists under § 1112(b) "rests in the sound discretion" of the bankruptcy court); In re Koerner, 800 F.2d 1358, 1367 & n. 7 (5th Cir. 1986) (bankruptcy court is afforded "wide discretion" under § 1112(b)).

45961/0001-7523116v5

has no choice, and no discretion in that it '**shall**' dismiss or convert a case under Chapter 11 if

the elements for 'cause' are shown under 11 U.S.C. § 1112(b)(4)") (emphasis added); In re 3

Ram, Inc., 343 B.R. 113, 119 (Bankr. E.D. Pa. 2006) ("Under new § 1112 when cause is found,

the court shall dismiss or convert unless special circumstances exist that establish that the

requested conversion or dismissal is not in the best interests of creditors and the estate").

      62.    Here, "cause" exists to dismiss the Debtors' bankruptcy cases because the Debtors

sold all their assets pursuant to the Amended Agreement, ceased business operations

immediately after the Closing, and do not have any funds in their estates to confirm a liquidating

plan.  Section 1112(b)(4) of the Bankruptcy Code provides a nonexclusive list of 16 grounds for

dismissal.  11 U.S.C. § 1112(b)(4)(A)-(P).  See Gateway Access, 374 B.R. at 561 ("Generally,

such lists are viewed as illustrative rather than exhaustive, and the Court should 'consider other

factors as they arise'") (quoting In re Brown, 951 F.2d 564, 572 (3d Cir. 1991)); 3 Ram, 343

B.R. at 117 ("While the enumerated examples of 'cause' to convert or dismiss a chapter 11 case

now listed in § 1112(b)(4) have changed under BAPCPA, the fact that they are illustrative, not

exhaustive has not"); accord In re Frieouf, 938 F.2d 1099, 1102 (10th Cir. 1991) (Section

1112(b)'s list is nonexhaustive).  One such ground is where a party-in-interest, including a

debtor-in-possession, shows that there is a "substantial or continuing loss to or diminution of the

estate and the absence of a reasonable likelihood of rehabilitation."  11 U.S.C. § 1112(b)(4)(A);

see also In re Camden Ordinance Mfg. Co. of Arkansas, Inc., 245 B.R. 794, 799 (E.D. Pa. 2000)

(debtor moved to dismiss its Chapter 11 case for "cause" based on continuing loss or diminution

of the estate after debtor ceased operations, and based on lack of reasonable likelihood of

rehabilitation); In re Continental Holdings, Inc., 170 B.R. 919, 931 (Bankr. N.D. Ohio 1994)

24

(debtor moved to dismiss its Chapter 11 case for "cause" based on continuing loss or diminution
of the estate and a lack of reasonable likelihood of rehabilitation).

63.     To demonstrate continuing loss to or diminution of the estate and absence of a
reasonable likelihood of rehabilitation, a party must establish:  (i) that there has been a
diminution in value of the estate; and (ii) the debtor does not have a "reasonable likelihood of
rehabilitation."  In re Citi-Toledo Partners, 170 B.R. 602, 606 (Bankr. N.D. Ohio 1994) ("Section
1112(b)(1) contemplates a "two-fold" inquiry into whether there has been a "continuing
diminution of the estate and absence of a reasonable likelihood of rehabilitation") (citing In re
Photo Promotion Assocs., Inc., 47 B.R. 454, 458 (Bankr. S.D.N.Y. 1985)).

64.     The Debtors satisfy the two-pronged inquiry in the case *sub judice*.  First, the
Debtors have sold substantially all their assets, no longer conduct any business and have no
means with which to fund a Chapter 11 plan.  Meanwhile, administrative expenses claims, such
as professional fees and UST fees, continue to accrue each day the Debtors remain in
bankruptcy.

65.     Second, the Debtors have demonstrated that they cannot confirm a Chapter 11
plan.  In order to confirm a Chapter 11 plan, the Debtors must satisfy, among other things,
Section 1129(a)(9)(C) of the Bankruptcy Code, governing the treatment of allowed priority tax
claims.  As discussed above, pursuant to the Amended Agreement, the Purchasers agreed to pay
only the Priority Claims.  Although the Remaining Priority Unsecured Claims have been filed
(such as, for example, the Division's Claims), the Debtors have no funds with which to pay
them.  Therefore, they are unable to meet the requirements of Section 1129(a)(9)(C) of the
Bankruptcy Code.  Moreover, there are no available assets from which to fund a distribution to

general unsecured creditors.  As such, the Debtors are not in a position to propose a confirmable Chapter 11 plan.

66.    In sum, the Debtors have met their burden of proving that their cases should be dismissed under Section 1112(b)(4) of the Bankruptcy Code and, therefore, the Motion should be granted.

**B.    Dismissal Under 11 U.S.C. § 1112(b) Is In The Best Interests of the Debtors' Estates and Creditors**

67.    Once a court determines that cause exists to dismiss a Chapter 11 case, the court also must evaluate whether dismissal is in the best interests of the estate and creditors.  See In re Superior Sliding & Window, Inc., 14 F.3d 240, 243 (4th Cir. 1994); In re Mazzocone, 183 B.R. 402, 411 (Bankr. E.D. Pa. 1995), aff'd, 200 B.R. 568 (E.D. Pa. 1996); In re Warner, 83 B.R. 807, 809 (Bankr. M.D. Fla. 1988).  Dismissal of a debtor's Chapter 11 case meets the best interests of creditors test where a debtor has nothing left to reorganize and the debtor's assets are fixed and liquidated.  See In re BTS. Inc., 247 B.R. 301, 310 (Bankr. N.D. Okla. 2000); In re Camden Ordinance Mfg. Co. of Arkansas, Inc., 245 B.R. 794, 799 (E.D. Pa. 2000) (finding that a reorganization to salvage a business which ceased doing business was not feasible); In re Brogdon Inv. Co., 22 B.R. 546, 549 (Bankr. N.D. Ga. 1982) (dismissing chapter 11 case in part where there was "simply nothing to reorganize" and no reason to continue the reorganization).

68.    Dismissal of these Chapter 11 cases is in the best interests of the Debtors' estates and creditors.  First, as noted above, the Debtors have sold all their assets and ceased business operations on the Closing.  Therefore, there is nothing left for the Debtors to reorganize or from which to realize value for the benefit of their creditors and estate.

69.    Additionally, the alternative to dismissal — conversion to Chapter 7 — would not serve any purpose as the Debtors' estates have been fully administered and there are no

remaining assets with which to pay any remaining claims (except for the Professional

Compensation Claims that the Purchasers have agreed to pay).  Thus, if these cases were

converted, a Chapter 7 trustee would inherit a "no asset" case.  Accordingly, conversion of the

Debtors' cases is not beneficial to creditors whatsoever.

<strong>C.    In the Alternative, Dismissal of the Debtors' Bankruptcy Cases<br>Is Warranted Under Section 305(a)(1) of the Bankruptcy Code</strong>

70.    Alternatively, cause exists to dismiss these Chapter 11 cases pursuant to Section

305(a) of the Bankruptcy Code, which provides, in pertinent part:

> (a)    The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if —
>
> (1)    the interests of creditors and the debtor would be better served by such dismissal or suspension;

11 U.S.C. § 305(a).

71.    Courts have considered a wide range of factors when construing Section 305(a),

including, but not limited to:

> (i) economy and efficiency of administration;
>
> (ii) whether federal proceedings are necessary to reach a just and equitable solution;
>
> (iii) whether there is an alternative means of achieving an equitable distribution of assets; and
>
> (iv) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves the interests in the case.

See In re Crown Village Farm LLC, Case No 09-11522 (KG), U.S. Bankr. LEXIS at *24 (Bankr.

D. Del. June 12, 2009)); see also In re Mazzocone, 200 B.R. 568, 575 (E.D. Pa. 1996); In re 801

South Wells Street Ltd. P'ship, 192 B.R. 718, 723 (Bankr. N.D. Ill. 1996); In re Realty Trust

Corp., 143 B.R. 920, 926 (D.N. Mariana Islands 1992); In re Fax Station, Inc., 118 B.R. 176, 177

(Bankr. D.R.I. 1990).  However, "the exact factors to be considered and the weight to be given to each of them is highly sensitive to the facts of each individual case."  Mazzocone, 200 B.R. at 575; In re Grigoli, 151 B.R. 314, 319 (Bankr. E.D.N.Y. 1993).

72.    Dismissal of these cases is warranted under Section 305(a)(1).  Dismissal, rather than conversion, represents the least expensive and most efficient method for concluding the Debtors' cases.  Additionally, given the absence of any assets in the Debtors' estates, and the fact that all claims the Purchasers agreed to pay under Section 3.2 of the Amended Agreement have been paid (other than Profession Compensation Claims, which will be paid upon approval of their final fee applications), there is no alternative means for achieving a distribution of assets.  Indeed, courts have approved dismissals of other Chapter 11 cases under similar circumstances pursuant to Section 305(a) of the Bankruptcy Code.  See, e.g., In re Business Information Co., 81 B.R. 382, 387 (Bankr. W.D. Pa. 1988); In re Spade, 258 B.R. 221 (Bankr. D. Colo. 2001); In re Scient, Inc., et al., Case No. 02-13455 (AJG), Docket No. 821 (Bankr. S.D.N.Y. 2006); In re CSI, Inc., et al., Case No. 01-12923 (REG), Docket No. 284 (Bankr. S.D.N.Y. 2006).

### D.    Dissolution of Adamar of NJ In Liquidation, LLC

73.    After the Closing, in accordance with the Amended Agreement and Sale Order, Adamar and Manchester Mall, Inc. merged into Adamar of NJ In Liquidation, LLC.  Following dismissal of these cases, it is the Debtors' intention to dissolve Adamar of NJ In Liquidation, LLC under the New Jersey Limited Liability Company Act, N.J.S.A. 42:2B-1 et seq. (the "NJ LLC Act") given that entity will be nothing but a "shell."

74.    The dissolution of a limited liability company is governed by N.J.S.A. 42:2B-48 and 42:2B-49.  That statute provides for dissolution upon the first to occur of: (i) unless the certificate of formation specifies that the limited liability company is perpetual, at the time specified in an operating agreement, or 30 years from the date of the formation of the limited

liability company if no specified time for dissolution and winding up; (ii) upon the happening of

events specified in an operating agreement; (iii) the written consent of all members, which

includes written consent of the sole member of a limited liability company with only one

member; (iv) ninety days after the date on which the limited liability company no longer has at

least one member, unless at least one new member is admitted within that 90-day period; or (v)

the entry of a decree of judicial dissolution under section 49 of the NJ LLC Act.  N.J.S.A. 42:2B-

48.

75.    After dissolving, a certificate of cancellation must be filed with the Secretary of

State to officially terminate the company's existence.  See N.J.S.A. 42:2B-14.  To obtain a

certificate of cancellation, New Jersey law requires New Jersey corporations to procure a tax

clearance certificate confirming payment of all taxes, fees, penalties and interest assessed against

it pursuant to New Jersey tax law.  See N.J.S.A. 54:50-14.  That statute, however, does not, on its

face, require New Jersey limited liability companies to obtain a tax clearance certificate.

76.    As discussed above, the Debtors do not have any funds to pay any remaining tax

claims.  The Division is fully aware of and acknowledges this fact.  Requiring the Debtors to

procure a tax clearance certificate in order to dissolve would be tantamount to raising form over

substance.  Accordingly, the Debtors request that this Court dispense with that requirement

pursuant to Section 105(a) of the Bankruptcy Code.

77.    Additionally, the New Jersey Corporations Act expressly authorizes the filing of

the cancellation without a tax clearance certificate in precisely the situation where, such as here,

a company has wound up its affairs, has not and will not make any distributions to shareholders,

has no remaining assets, intends to dissolve, but does not have the ability to obtain a tax

clearance certificate.  N.J.S.A. 14A:12-4.1.

45961/0001-7523116v5

78.     Pursuant to Section 105(a), the Court has expansive equitable powers to fashion any order or decree that is necessary or appropriate to carry out the provisions of the Bankruptcy Code.  11 U.S.C. § 105(a); see also In re Continental Airlines, 203 F.3d 203, 211 (3d Cir. 2000); In re G-I Holdings, Inc., 327 B.R. 730, 740 (Bankr. D.N.J. 2005); In re Chinichian, 784 F.2d 1440, 1443 (9th Cir. 1986); Bird v. Crown Convenience (In re NWFX, Inc.), 864 F.2d 588, 590 (8th Cir. 1988).  Absent an Order from this Court authorizing the Debtors to dissolve without a tax clearance certificate, the Debtors may be compelled to remain an "active" limited liability company.  Under the NJ LLC Act, so long as they remain an "active" company, the Debtors would be required to pay annual fees and minimum taxes, see N.J.S.A. 42:2B-65 and 42:2B-69, although they have no funds to do that.  Additionally, they would have to prepare and file annual New Jersey tax returns and an annual report with the New Jersey Division of Revenue.  See N.J.S.A. 42:2B-8.1.  No purpose would be served by the Debtors remaining an "active" business entity.  To avoid such futility, this Court should authorize the Debtors to dissolve under New Jersey state law without having to procure a tax clearance certificate.

## IV.    NOTICE

79.     The Motion has been served on (a) the UST, (b) all parties on the Core and Master Service Lists, and (c) all applicable taxing authorities.

80.     Due to the sheer volume of the Motion papers, a Notice of Hearing on the Motion, attached as **Exhibit A**, which notice makes clear the relief sought in the Motion and how it affects parties in interest, has been served on (a) all creditors who have filed claims as of the various bar dates set in these cases, which have not been expunged, (b) all creditors listed on Schedules E and F of the Debtors' schedules of liabilities, (c) all known counterparties to executory contracts and unexpired leases as of the Closing, (d) all potential claimants involved in the Post-Petition Personal Injury Incidents, and (e) holders of the Professional Compensation

45961/0001-7523116v5

Claims.  Copies of the pleadings filed in support of the Motion may be downloaded at

www.kccllc.net/TropicanaAC or requested directly from counsel to the Debtors, Cole, Schotz,

Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main Street, Hackensack, New Jersey

07601, by telephone: 201-525-6278, facsimile: 201-678-6278 (Attn: Ryan T. Jareck, Esq.), or e-

mail: rjareck@coleschotz.com.

        WHEREFORE, the Debtors respectfully request that the Court enter an Order granting

the Motion and such other relief as the Court deems just and appropriate under the

circumstances.

                                        Respectfully submitted,

                                        COLE, SCHOTZ, MEISEL,
                                        FORMAN & LEONARD, P.A.
                                        Attorneys for Adamar of NJ In Liquidation,
                                        LLC, f/k/a Adamar of New Jersey, Inc. and
                                        Manchester Mall, Inc., Debtors



                                        By:___/s/ Ilana Volkov_____
                                               Michael D. Sirota
                                               Ilana Volkov

DATED:  April 28, 2011

45961/0001-7523116v5